# Richmond.

## Petersburg Gas Company v. City of Petersburg, et als.

### February 2, 1922.

### Absent, Saunders, J.

1. Appeal and Error—*Appeal from Decision of State Corporation Commission—Certification of the Evidence or the Facts.*—Section 156-f of the Constitution of 1902 requires upon appeal from a decision of the State Corporation to the Supreme Court of Appeals that the commission certify the facts upon which the action appealed from was based, and not merely the evidence that was introduced before it. It was never intended that the appellate court should have to examine a large amount of conflicting testimony and ascertain therefrom the facts upon which the commission based its conclusions.

2. Constitutional Law—*Just Compensation for Taking Property— Gas—Fixing Rates—"Reasonable Compensation"*—Both the State and federal constitutions forbid the taking of private property for public use without making just compensation therefor, and the common law forbids the taking of private property of one person and giving it to another, with or without just compensation. If, therefore, a gas company is compelled by a decision of the State Corporation Commission to furnish its customers gas at less than "reasonable compensation," the requirement is illegal.

3. Constitutional Law—*Just Compensation—Rates Charged by Public Utility—Rendering Utility Securities Attractive to the Investing Public.*—That for which the utility company is entitled to "just compensation" is the use of its property appropriated to the public benefit, and the value of that use is founded upon the fair value of the property so used, and not upon the amount of stock it has issued or the debts it may owe. In fixing a rate which will be just and reasonable, it must be borne in mind that the utility shall be allowed to realize such a net income upon the value or amount of its investment as will, when prudently managed, render its securities attractive to the investing public. Otherwise there will result inferior service to

the public and ultimately bankruptcy of the utility, and disaster as well to the public as the utility.

4.  GAS—*Fixing Rates—Duty of State Corporation Commission.*— In fixing the rates which a gas company was allowed to charge to its patrons for gas, where it was not claimed that the plant of the gas company was larger than necessary, the duties devolved upon the State Corporation Commission were (1) the ascertainment of the fair value for rate-making purposes of the property of the gas company, used or useful in furnishing gas to its patrons. (2) the fixing of the rate or per cent. the gas company should receive on said fair valuation, after deducting costs of operation and any other legitimate expenses, and (3) the amount per thousand cubic feet to be paid by consumers in order to raise the necessary funds to pay all costs and expenses and the compensation to be received by the gas company.

5.  GAS—*Fixing Rates—Duty of State Corporation Commission— Method of Valuation of Plant.*—A fair method of determining the value of the property of a gas company for rate-making purposes is to take the reproduction cost, less observed depreciation, where the utility has not been allowed to earn in the past a depreciation reserve greater than the observed depreciation.

6.  GAS—*Fixing Rates—State Corporation Commission—Appeal— Presumption in Favor of the Findings of Commission.*—Where it is impossible to tell from the record how the commission arrived · at its valuation of a gas company's plant in the absence of the facts required by the Constitution to be stated, the appellate court cannot presume *Prima facie* that the findings of the commission were correct.

7.  GAS—*Fixing Rates—Duty of State Corporation Commission— Method of Valuation of Plant—Time of Reproduction Cost— Pre-War Prices.*—In the instant case there was a fundamental error in the decision of the State Corporation Commission fixing rates which a gas company was allowed to charge to its patrons for gas in taking the pre-war unit of prices as practically the sole basis for ascertaining the reproduction value of the property of the gas company for rate-making purposes.

8.  GAS—*Fixing Rates—Duty of State Corporation Commission— Method of Valuation of Plant—Time of Reproduction Cost— Pre-War Prices.*—Where three years had elapsed since the war and neither labor nor materials had declined to anything like pre-war prices, in determining the reproduction cost of a gas plant for rate-making purposes, enough time had elapsed to furnish a basis for calculating reproduction costs as of the time

of the valuation, and a valuation based upon reproduction costs of pre-war times was erroneous.

9. GAS—*Fixing Rates—Cost of Operation.*—Operating expenses are accruing from day to day, and are determined by the prices of today and not of some future date. In any estimate of rates to be paid by the consumer of gas, it is essential to ascertain the costs of operation, for the gross receipts less the costs of operation is what the gas company gets for its service. The actual cost of its operation must always be taken into consideration in determining whether or not it receives a fair compensation above that cost.

10. GAS—*Rates Fixed by Corporation Commission—Method to be Adopted.*—In fixing the rates which a gas company might charge its patrons, the State Corporation Commission, where the gas plant was not larger than necessary, after fixing the value thereof for rate-making purposes, should have determined the rate of return the company should receive on such valuation and the costs per thousand cubic feet of operation. The aggregate of these two sums divided by the number of thousand cubic feet of gas to be sold would give the price to be charged to the consumer.

11. GAS—*Fixing Rates—Losses.*—The losses sustained by a gas company prior to its application for an increase of rates should not be amortized, but if, upon further investigation, it is ascertained that a loss has been sustained since the date of the company's application in consequence of the rate fixed by the commission, such loss should be amortized and spread over such a term of years as will be fair to the gas company and not too burdensome to the consumers.

12. GAS—*Fixing Rates—Taxes.*—If in any rate fixed by the State Corporation Commission the gas company should make a profit upon which a tax is imposed, that should be taken into consideration in fixing the per cent. of return it is to receive on its investment.

13. GAS—*State Corporation Commission—Regulation of Service.*— The regulation of the character of service to be furnished to its customers by a gas company is fully within the powers of the State Corporation Commission.

14. APPEAL AND ERROR—*Appeal from State Corporation Commission —Remand.*—Upon an appeal from a decision of the State Corporation Commission fixing rates which a gas company was allowed to charge to its patrons for gas, in the absence of any statement of facts found by the commission or any tabulation of figures, the Supreme Court of Appeals was unable to say what rate of charge to the consumer would be fair and

reasonable to both the consumer and the gas company, and the case was therefore remanded to the State Corporation Commission.

Appeal from an order of the State Corporation Commission.

*Remanded.*

The opinion states the case.

*Mann & Townsend,* for the plaintiff in error.

*R. B. Willcox* and *Chas. Hall Davis,* for the defendants in error.

BURKS, J., delivered the opinion of the court.

This is an appeal from a decision of the State Corporation Commission, fixing rates which the Petersburg Gas Company was allowed to charge to its patrons for gas. The record is not made up in the chronological order of events as they occurred before the commission (as it should have been), and it is only after searching through the record that we are able to state the case in that order.

On February 13, 1920, the gas company filed a new schedule of rates before the Corporation Commission, effective March 15, 1920, by which there was an increase in the maximum rate allowed for regular meters from $1.15 per thousand cubic feet to $1.60 per thousand cubic feet. This increase was asked in view of the increased cost of labor and materials and because the operating expenses for the year 1919 more than consumed the total income of the gas company. On June 29, 1920, the engineer of the commission filed a report in which, among other things, he stated "that the services rendered by the Petersburg Gas Company may be considered as a fair average compared with other cities in Virginia and in the eastern United

States." On July 21, 1920, the said engineer filed a second report, in which he gave his estimate of the net value of the plant for rate-making purposes at $209,000. The gas company was contending for a valuation of $481,000, and had no information as to the filing of this second report. On August 2, 1920, the State Corporation Commission delivered an opinion based upon the second report of its engineer, fixing the maximum rate for regular meters at $1.50 per thousand cubic feet, and criticising the gas company for attempting to collect rates based on an excessive valuation of its property. The opinion also suggested a careful examination of the company's property by an expert engineer. Upon the filing of this opinion the gas company promptly asked for a valuation of its property for the purpose of rate making by an expert engineer, and furnished the names of a number of such experts, stating that it was perfectly willing to have the valuation made by any one of those named, or any other competent expert that might be selected by the commission. The commission selected from the list thus furnished the firm of Forstall & Robison, of New York city, engineers of wide experience and very decided ability. On August 23, 1920, the commission addressed a communication to Forstall & Robison in the following language:

"In view of your employment by the Petersburg Gas Company, with the approval of the commission, for the purpose of making an inventory and appraisal of its property, so as to ascertain its fair value, this is written for the purpose of outlining the commission's views.

"It is desired to ascertain the value of the company's property on the 1st day of January, 1917, based on the average unit price of the preceding five years. This does not, of course, prevent the company from advancing any other basis of arriving at the value that it desires to present in connection with this case. In arriving at depreci-

ation, the commission wishes, in addition to any basis used by you in determining this element, to be advised as nearly as you can do so of the age and wear of the various elements composing the property and ascertainable as far as possible from the records and the probable age of any property that may have been bought second hand.

"To the value as of January 1, 1917, there is, of course, to be added, the purchases at cost since that date to the most recent available date, July the 1st, if practicable.

"The commission also desires the financial history of the company, in the main, as outlined on pages 4 and 5 of the paper filed today by the Young Men's Business Club and the Gas Consumers' League of Petersburg.

"We assume that report will include, as usual, a statement as to the general condition of the plant in its relation to its public service and such suggestions as may occur to you for improvement and efficiency."

Pursuant to the foregoing instruction, Mr. Forstall, of the firm of Forstall & Robison, made the valuation, based on the average unit price for the five years, 1912-1916, and ascertained the net fair valuation of the property on the pre-war basis for rate-making purposes at $405,130. At the request of the gas company, Mr. Forstall filed a second report on December 11, 1920, using the average unit price for the five years, 1915-1919, inclusive, and arrived at the depreciated value of the property, with intangibles of $620,-880. He testified that the value of the property based on the average price for the year 1920 would be twenty-five to thirty per cent higher than the figures stated in the last-mentioned report. On December 29, 1920, he filed a third report, fixing the value based on the financial history of the company in accordance with the letter of instructions of August 23, 1920, of the commission, in which he ascertained the value of the plant as of June 30, 1920, to be $453,700. Hearings were had by the commission on these

various reports on January 13, 14, 27 and February 21, 1921. Pending these hearings, the gas company filed a new schedule of rates in which they asked that the rate for regular meters be raised to $2.35 per thousand cubic feet. After these hearings and argument by counsel, the commission rendered its opinion on March 24, 1921, in which it fixed the value of the property for rate-making purposes at $318,-350, and the rate allowed to be charged for regular meters at $1.75 per thousand cubic feet. It is from this decision that the present appeal is allowed.

The chief objections to the decision are (1) that the commission, in valuing the property of the gas company, fixed the value entirely with reference to the average pre-war unit price for the years 1912-1916, inclusive, and (2) that the commission erred in applying the depreciation of twenty-six and one-half per cent to the valuation of the gas property based upon the age of the various component parts of the plant. The commission fixed the value of the plant at $318,350, but the opinion does not show how this valuation was arrived at. There was conflict of testimony as to what portions of the real estate of the company were used, or useful, for the business of the company, and while the opinion shows that it had not accepted Mr. Forstall's report and testimony on the subject, it failed to show what portion of said real estate was not so used, or useful, or the value thereof. It also fails to state what rate of return it allowed upon the valuations fixed by it, or the rate of annual depreciation, or the fair cost of operation, facts which if found and stated would be helpful to an intelligent review of its holding. The opinion does not show, and we are unable to ascertain from it, the reasons which justified the commission in fixing $1.75 as a fair rate to be charged per thousand cubic feet.

[1] The Constitution, section 156-f, requires the chairman of the commission to "certify to the appellate court all facts

upon which the action appealed from was based, and which may be essential for a proper decision of the appeal, together with such of the evidence introduced before, or considered by, the commission, as may be selected, specified and required to be certified by any party in interest as well as such other evidence so introduced or considered, as the commission may deem proper to certify." It will be observed from this quotation from the Constitution that the commission is required to certify the facts above mentioned, and not merely all the evidence that was introduced before it. It was never intended that the appellate court should have to examine a large amount of conflicting testimony and ascertain therefrom the facts upon which the commission based its conclusions. The gas company insists that it applied time and again for this certificate of facts, but without avail.

[2] Both the State and federal Constitutions forbid the taking of private property for public use without making just compensation therefor, and the common law forbids the taking of private property of one person and giving it to another, with or without just compensation. If, therefore, the gas company is compelled to furnish its customers gas at less than "reasonable compensation," the requirement is illegal.

[3] The subject of rate making should be approached by commissions and courts with a view to doing what is fair and just between the parties under all the circumstances of the particular case. That for which the utility company is entitled to "just compensation" is the use of its property appropriated to the public benefit, and the value of that use is founded upon the fair value of the property so used, and not upon the amount of stock it has issued or the debts it may owe. The rate of return on such "fair value" which the utility company should be allowed to receive should be fair and just to the company and such as will make its se-

curilies attractive to investors when the company is prudently and carefully operated. "The utility is entitled to ask a fair return upon the value of that which it employs for the public convenience; but, on the other hand, the public is entitled to demand that no more be exacted from it than the services are reasonably worth." *State Public Utilities Com'n* v. *Springfield Gas & Elec. Co.*, 291 Ill. 209, 125 N. E. 891, 895, and cases cited. *In re Potomac Electric Power Co.* (Dist. of Col.), P. U. R. 1917D 563, it is said that the return allowed should be one "which will be fair to the investor, who has directed his energies and devoted his substance to the creation of this instrumentality, and fair and just likewise to the consumer, who, under modern conditions, is compelled to use the product of the utility in his daily business, social and domestic life." While the utility enjoys a monopoly which it should not be permitted to use to the public detriment, at the same time it has invested its skill and capital in an enterprise that is essential to the comforts and convenience of life, and which requires large sums of money for the payment of operating charges, repairs, replacements, improvements, interest charges, taxes, sinking fund, and other purposes connected with the necessary and proper operation of its plant. These sums are to be obtained from the lending public on the faith of the security offered by the utility company. In fixing a rate, therefore, which will be just and reasonable, it must be borne in mind that the utility shall be allowed to realize such a net income upon the value or amount of its investment as will, when prudently managed, render its securities attractive to the investing public. Otherwise, there will result inferior service to the public and ultimately bankruptcy of the utility, and disaster, as well to the public as the utility.

In *Elizabethtown Gas Light Co.* v. *Public Utility Com'n* (N. J. Sup.), 111 Atl. 729, in referring to an undervaluation

of a gas plant, it was said: "This 'suffices to show that the amount of return allowed to the companies would probably be insufficient under present circumstances to *attract capital to the business, and this was one of the important tests of the justice and reasonableness of the rate as decided in the Passaic Case.*" (Italics supplied.)   See also *State Public Utilities Com'n* v. *Springfield Gas & Electric Co.*, 291 Ill. 209, 125 N. E. 891; *Passaic Rate Case (Public Service Gas Co.* v. *Board of Public Utilities Com'r)*, 84 N. J. L. 463, 87 Atl. 651, L. R. A. 1918A 421. The disastrous effect of failure to allow just and reasonable compensation to public service companies is well summed up by the Supreme Court of the United States in *Knoxville* v. *Water Co.*, 212 U. S. 1, 18, 29 Sup. Ct. 148, 154 (53 L. E. 371), as follows: "Our social system rests largely upon the sanctity of private property, and that city or community which seeks to invade it will soon discover the error in the disaster which follows.  The slight gain to the consumer which he would obtain from a reduction in the rates charged by public service corporations is as nothing compared with his share in the ruin which would be brought about by denying to private property its just reward, thus unsettling values and destroying confidence."

[4] If the plant was much larger than necessary, a different question would arise as to the valuation, but it is not claimed that the plant was any larger than was necessary for the purpose for which it was used, and the duties devolved upon the State Corporation Commission in the case in judgment were (1) the ascertainment of the fair value for rate-making purposes of the property of the gas company, used or useful in furnishing gas to its patrons; (2) the fixing of the rate or per cent the gas company should receive on said fair valuation, after deducting costs of operation and any other legitimate expenses; and (3) the amount per thousand cubic feet to be paid by consumers in order to raise the necessary funds to pay all costs and expenses and the

compensation to be received by the gas company.   Compare *State Public Utilities Com'n* v. *Springfield Elec. Co.*, 291 Ill. 209, 125 N. E. 891, 902.

[5] Several methods have been suggested as helpful in ascertaining the value of property for rate-making purposes. One of these is to take the reproduction cost, less observed depreciation.   As a general rule, and where the utility has not been allowed to earn in the past a depreciation reserve greater than the observed depreciation, this seems to be the fairest method and the one best supported by authority, and as the State Corporation Commission attempted no other, and apparently adopted this method, in part at least, it is unnecessary to make further reference to other methods.   The costs of labor and materials were greatly inflated by the world war, and have not yet receded to pre-war rates, nor is it probable that they will so recede in the near future, if ever.   The result is that it has been found difficult to determine as of what date the unit of prices shall be fixed.   In the letter of instructions to the engineers, the commission directed them to take the average unit price for the five years preceding January 1, 1917.   Its reason therefor finds expression in the case of the *Chesapeake & Potomac Telephone Co.* (Va.), P. U. R. 1920F, 49, cited in its opinion in this case, where it was said that "it seems to the commission that a reproduction value as of normal times at pre-war prices, plus the actual sums necessarily expended during the period of inflation, less the deductions discussed above, is a fair and reasonable basis," and, so far as we can gather from the opinion of the commission, this is the basis upon which it fixed the value of the property of the gas company for the purpose of fixing the rate. It apparently refused to consider values as of any other time on the ground that they were not normal.   Referring to the contention of the gas company that the value of the property should be ascertained by "using unit prices as of

the time when the valuation was made," the commission said:

"This commission has, time and time again, pointed out the essential unfairness and impracticability of such a proposition.    References may be made to the opinions of this commission, in *Re Roanoke Water Works Co.*, P. U. R. 1920C, page 745; *Re Culpeper Telephone Co.*, P. U. R. 1920D, 305; *Re Chesapeake & Potomac Telephone Co. of Va.*, P. U. R. 1920F, page 49; *Re Rosslyn Co.* (not reported) ; *Re Bristol Gas & Electric Co.* (not reported) ; *Re Virginia Railway & Power Co.*, P. U. R. 1921C, 193, decided March 18, 1921.

"Unquestionably some recent court decisions tend to uphold the view advanced by the Petersburg Gas Company."

After repudiating these "recent court decisions," and making lengthy quotations from the Indiana Public Service Commission in the *La Porte Case*, hereinafter mentioned, the commission says:

"We stand by the method of valuation outlined in our instructions to Forstall & Robison, believing it conforms to the standard laid down by the United States Supreme Court in the *Consolidated Gas Case*—'the reasonable value of the property at the time it is being used for the public.'

*            *            *            *

"The commission knows, and knew when it authorized the Petersburg Gas Company to employ any one of the list of engineers submitted by it, that the firm of Forstall & Robison is entirely reputable and reliable.    Any student of public utilities' reports also knows that, in addition to the entirely trustworthy reports of physical values made by engineering firms, the engineers invariably advance theories as to additional values.    Such student also knows that in most cases the engineering theories are materially reduced by commissions in accordance with their conception of reasonable values, taking into consideration, as laid

down in the master case of *Smyth* v. *Ames*, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, 'all the elements.'

"There is also room for exercise of judgment in the degree of accrued depreciation to be deducted from the rate base.

"Under the circumstances, the commission adheres to its opinion that the reproduction cost theory applied at the time the property is being used in the public service does not reasonably mean that unit prices as of that date must be accepted. A valuation made today would show lower figures than the valuation made June 30, last. However much it might suit the engineers, it would be destructive of every theory of regulation if the utilities, the public and commissions were forced to keep on having new reproduction cost valuations with each change in unit prices.

"So we say that if the present trend of court decisions is to be taken as requiring the ascertainment of reproduction costs as of the particular date on which the calculation is made, the entire reproduction theory must go into the discard and be succeeded by the historical method with all of its obvious defects.

"It is evident that in this case there should be some deduction from Forstall's figures of land values covering property in use or useful to the public; further, that paving over street mains must be deducted, and also value of property turned over to the Interstate Appliance Corporation, together with most of the value of the trestle. Under all the circumstances surrounding the history of this company, ten per cent of the construction value is sufficient allowance for overheads, including engineering, supervision, legal expenses during construction, taxes, interest and insurance during construction. Materials and supplies, with working capital, must, of course, be allowed in accordance with the experience of the company. A fair deduction for accrued depreciation on the physical property would, it

seems to the commission, with all the light before it, be 26.5 per cent. Going value is given its due weight.

"We thus arrive at a fair valuation of the property of the Petersburg Gas Company for rate-making purposes, as of June 30, 1920, at three hundred and eighteen thousand three hundred and fifty ($318,350) dollars."

[6] Even if we concede the premises, we are unable to draw the conclusion stated in the last paragraph. The value of the real estate used or useful in the operation of the plant is universally conceded to be not subject to any reductions, but the value thereof is not stated. The amount estimated for paving over streets and the value of the property turned over to the Interstate Appliance Company had already been deducted from Forstall's statement, and the depreciation on the different portions of the physical property was most probably not the same, and we have no means of knowing on what sum the 26.5 per cent of depreciation was calculated. The opinion does not state the facts upon which its calculation is based. Hence, it *does not thus appear* that $318,350 is a fair valuation. The commission apparently adopted substantially Forstall's pre-war unit valuation of $504,130, except as to the real estate, but it differed from him, as did its engineer, Dickerman, as to the amount to be deducted for depreciation. If, however, we take twenty-six and one-half per cent off of Forstall's valuation ($132,-594), we would have left $371,536, and not $318,350, fixed by the commission. It is impossible to tell from the record how the commission arrived at its valuation. In the absence of the facts required by the Constitution to be stated, we cannot presume *prima facie* that the findings of the commission are correct. As said in the *Springfield Case, supra,* "Where it appears from the finding of the commission that only a certain proportion of the actual value of the whole, or any considerable part of the property of the utility, is to be taken into consideration, then such value must

be stated by the commission, or the proportion considered must be stated; otherwise, this court will be helpless in an effort to review the reasonableness of the commission's finding and order."

[7] But there is fundamental error in taking the pre-war unit of prices as practically the sole basis for ascertaining the reproduction value of the property of the gas company for rate-making purposes. What is said in the opinion of the commission with reference to the costs of producing gas is equally applicable to the cost of reproducing the plant. It is there said, "In any event, there seems little possibility of a return to a general pre-war level. The natural resources of the country are approaching depletion, and when it costs more to mine a ton of coal because it is further back in the mountain, and where there is less lumber in the country every year, and when the oil supply will inevitably decrease, and when the general level of labor will likely be above that of pre-war years, evidently the prices of the past cannot be realized." These seem to be good reasons why pre-war prices of reproduction should not be adopted.

We have no case from the Supreme Court of the United States involving rate making as affected by the inflated prices of the war period, but there are several cases involving a variation of prices from other causes.

In *San Diego, etc., Co.* v. *City of National City*, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, it is said: "What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the *reasonable value of the property at the time it is being used for the public.*" (Italics supplied.) The commission emphasized the word "reasonable" in the foregoing quotation, and claimed to follow that holding, but departed from it by holding that a value based on a pre-war unit price gave the "reasonable value," although it

admitted that there was "little possibility of a return to a general pre-war level."

In *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 52, 29 Sup. Ct. 200, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034, it is said: "And we concur with the court below in holding that the value of the property is to be *determined as of the time when the enquiry is made regarding the rates.*" (Italics supplied.)

[8] Three years have elapsed since the close of the war, and neither labor nor materials have declined to anything like pre-war prices. When, if ever, they will, no one can foretell. It would seem that time enough had elapsed to furnish a basis for calculating reproduction costs.

In *Consolidated Gas Co.* v. *Newton* (Southern Dist. New York), 267 Fed. 231, 236, Judge Hand said that, so far as he had found in the books, a test of two years was enough, and cited *Minnesota Rate Cases*, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A 18, and *Municipal Gas Co.* v. *Public Service Commission*, 225 N. Y. 89, 121 N. E. 772. On the same subject, he further said: "The master has taken complete evidence over a period of twenty months—from January 1, 1918, to August 31, 1919. Since that time, eleven more months have passed, during which there has been no fall in price levels. The record has some evidence of this down to a later ·day, but, of course, not down to the date of this opinion. But evidence is not necessary in the face of so patent and obtrusive a fact of daily life, and it is quite fair to say that the condition which the master found as of August 31, 1919, has been aggravated during the succeeding year. The period, despite its unusual character, I find to be a sufficient basis for the calculation of the cost of production and the 'rate base' for a future time long enough to call for some judicial action."

On the subject of the computation of the "rate base," the

7

same distinguished judge said: "The rule of the present reproduction cost as a necessary consequence of the foregoing argument, appears to me to have been either expressly or impliedly recognized in all the cases in which the Supreme Court has passed on these matters. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 41, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, 48 L. R. A. (N. S.) 1134; *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, 35 Sup. Ct. 811, 59 L. Ed. 1244; *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 10, 29 Sup. Ct. 148, 53 L. Ed. 371; *The Minnesota Rate Cases*, 230 U. S. 352, 434, 454, 455, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; *San Diego, etc., Co.* v. *National City*, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154; *San Diego, etc., Co.* v. *Jasper*, 189 U S. 439, 442, 23 Sup. Ct. 571, 47 L. Ed. 892; *Darnell* v. *Edwards*, 244 U. S. 564, 568, 37 Sup. Ct. 701, 61 L. Ed. 1317. It is true that its application has not distinctly arisen since the recent rise in prices, but it is not possible that it should have general application, and yet not cover this, its most glaring illustration."

In *St. Joseph, etc., Co.* v. *Public Service Com'n of Missouri* (Dist. Ct. W. D. Mo., C. D.), 268 Fed. 267, it is said: "The commission took the original cost, when obtainable, and, when not obtainable, average prices for a fixed period of five years before war prices prevailed, going back approximately to the year 1910. * * *  It is my judgment that the great weight of authority is against the adoption of a standard of original cost as a controlling basis for determining present value. *The present fair value is the object to be attained. Nor do I think it permissible substantially to restrict the enquiry to a period antedating present cost prices.*" (Italics supplied.)

In *Elizabethtown Gas Co.* v. *Public Utility Com'rs* (N. J. Sup.), 111 Atl. 729, the commission adopted as a standard of value the average prices prevailing for five years preced-

ing January 1, 1916. Swayze, J., speaking for the Supreme Court of New Jersey, said: "I think it entirely clear that the failure to allow for prices at the time to which the rates apply, July 1, 1919, was an error. It is not denied that prices were very much higher in 1919, and are very much higher now, than the average for the years 1911 to 1916. So notorious is this that the Supreme Court of the United States has referred to it in an opinion as a matter of common knowledge. *Lincoln Gas Co.* v. *Lincoln,* 250 U. S. 256, at p. 268, 39 Sup. Ct. 454, 63 L. Ed. 968. In that case, on its own responsibility, the court suggested that, in its opinion, the decree ought to be modified to permit the complainant to make another application to the courts for relief. It would be manifestly unjust to apply to a gas company a standard of value different from that applied to others. To what extent the increase in prices may be due to an inflation of the currency or to any other particular cause, we do not know. What we do know is that the dollar of 1919 and the dollar of 1920 is worth less than the dollar of 1916, and still less compared with the dollar of the average year from 1911 to 1916. If it were proposed to value the property of the gas company on 100-cent dollars and allow them a return only on that, while other values were on the basis of fifty-cent dollars and just double in number, every one would see the injustice; so far as the increase in prices is due to inflation of the currency, the illustration is a perfect one."

In *Smyth* v. *Ames,* 169 U. S. 546, 18 Sup. Ct. 433, 42 L. Ed. 819, Mr. Justice Harlan, speaking for the court on the subject of railroad rates, said: "The corporation may not be required to use its property for the benefit of the public without receiving just compensation for the services rendered by it. How much compensation may be ascertained, and what are the necessary elements in such an enquiry will always be an embarrassing question. * * *

"What the company is entitled to ask is a fair return

upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

The word "value" has a peculiar meaning when applied to rate making. *In Re Potomac Electric Power Co.* (Dist. of Columbia), P. U. R. 1917D, 563, 694, it is said:

"The use by the courts and commissions in rate cases of the expressions that public service corporations are entitled to 'a reasonable return upon the fair value of their property' or 'a reasonable return upon the reasonable value of their property,' and similar pronouncements, and the methods adopted by the different commissions and courts in arriving at this fair or reasonable value, clearly indicate that the object and purpose of every valuation upon which rates are to be based is an ascertainment of but one thing—not what the property is worth as an income-producing instrumentality; not for what it would sell or could be bought; not its worth because of its being a monopoly or the holder of rights, easements, franchises, privileges, and benefits accorded it over others to enable it to perform its public duty: but a determined amount, an ascertained and fixed sum, upon which the owners may earn a fair and reasonable return. The sum so arrived at should be one upon which a return may be allowed which will be fair to the investor, who has directed his energies and devoted his substance to the creation of this instrumentality, and fair and just likewise to the consumer, who, under modern conditions, is compelled to use the product of the utility in his daily business, social and domestic life.

"If the word 'amount' is substituted in place of the word 'value' in paragraph 7 of the public utilities law, and, in the judgment of the commission, such a substitution not only does no violence to the word 'value,' but gives to it

a meaning which Congress intended it should convey, it would follow that it is the duty of this commission to ascertain the fair amount which should represent a just basis for rates of this particular utility as of the time so determined.

"If this view is taken, the determination of fair value becomes the determination of that just and equitable amount upon which, under all the facts, circumstances and conditions of the utilities' construction up to the time of valuation, the return allowed to the utility should be computed."

*In Re Central Union Tel. Co.* (Ind.), P. U. R. 1920B, at p. 825, it is said: "Moreover, assuming normal costs and usual and ordinary conditions, cost of reproduction is not necessarily controlling, for consideration and weight must be given to all other elements entering into the fair value of the property."

The subject of rate making, especially as applied to a gas company, is discussed with marked ability and a very full citation of authority by the Supreme Court of Illinois in *State Public Utilities Commission* v. *Springfield Gas & Electric Co.*, 291 Ill. 209, 125 N. E. 891. It is there said: "The difficulty is that which is always present—to ascertain a standard by which this justice and reasonableness shall be gauged. The necessity of public regulation of rates arises out of the monopoly of the public service company. The unregulated price of the service ceases, except so far as some substitute for the particular service may be found, to be determined by competition, and the individual consumer is unable to contract on equal terms. Fixing rates by public authority may secure to each individual the advantage of collective bargaining by or in behalf of the whole body of consumers, and result in such a rate as might properly be supposed to result from free competition if free competition were possible. A just and reasonable rate, therefore,

is necessarily a question of sound business judgment rather than one of legal formula, and must often be tentative, since exact results cannot be foretold. *Public Service Gas Co.* v. *Utility Com'rs, supra.* Like so many other questions in the law that involve reasonableness of conduct, it is a question of fact to be settled by the good sense of the tribunal it may come before. That it is not a question of legal formula, is shown by a decision of the United States Supreme Court in *San Diego Land & Town Co.* v. *Jasper, supra,* that a rate may be reasonable, although it fails to produce an adequate return to the public service company, owing to the fact that the business has not developed sufficiently to be remunerative, or to the fact that the plant is on a larger scale than is justified by the present demand. The real test of the justice and reasonableness of any rate seems to be that it should be as low as possible, and yet sufficient to induce the investment of capital in the business and its continuance therein. This, also, is a business question, and depends on the opportunities that may be offered for more profitable investments and the risk involved. In determining the justice and reasonableness of rates, perhaps no better test can ordinarily be found than the rates customarily charged in localities similarly situated. And yet this test is not by any means infallible. What is a reasonable return is a question of fact, the solution of which calls for the exercise of sound judgment and common sense. *Duluth Street Railway Co.* v. *Railroad Com.,* 161 Wis. 245, 152 N. W. 887.

"Appellee contends that the only equitable basis for determining value for rate-making purposes is the cost of reproduction now, less depreciation. This contention cannot be sustained. The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a public utility under legislative sanction must be the fair value of the property being used by it for the con-

venience of the public, and in order to ascertain that value the original cost of construction, the amount expended in permanent improvements, the present cost of construction, the probable earning capacity of the property under the particular rates prescribed by statute, and the sum required to meet operating expenses are all matters for consideration and are to be given such weight as may be just and right in each case. *Smyth* v. *Ames, supra; San Diego Land & Town Co.* v. *National City, supra; Stanislaus County* v. *San Joaquin and King's River Canal & Irrigation Co., supra*; *Chicago Union Traction Co.* v. *City of Chicago, supra; Duluth Street Railway Co.* v. *Railroad Com., supra.*

The subject is beset with difficulties, and no hard and fast rule can be safely laid down for fixing values for rate-making purposes. Many of the items which enter into the determination of values are mentioned in the cases we have cited, and the commission seems to have given the subject careful consideration. It has, however, emphasized the pre-war unit of valuation, but the reasoning of the opinion seems to indicate that it has not given due weight to the present costs of reproduction and the probable costs thereof during the near future, or for the time during which the rate fixed will pobably be in force, and hence we cannot presume that it has. These are important items to be considered, and it should not be left in doubt whether or not they have been taken into consideration.

It may be said of valuation, what has been said of the return to be allowed: "What is a reasonable return is a question of fact, the solution of which calls for the exercise of sound judgment and common sense." We are constantly measuring ordinary care by the conduct of the "ordinarily careful man," and so here, after hearing all that is said affecting value, we must measure value by the "sound judgment and common sense" of impartial tribunals charged with the ascertainment of such value.

The *La Porte Case,* so largely relied on by the commission and by counsel for the appellee in their brief, loses much of its force by reason of the fact that the opinion was concurred in by only three out of five of the commissioners. The opinion of Commissioner Haynes is an able one, but Commissioner Johnson only concurred in the order to be made in that case, "but not in the opinion," and Van Auken, commissioner, dissented. The case, furthermore, does not accord with the cases we have cited.

Counsel for the appellee also rely upon the finding of Mr. Justice Hughes, as referee, in *Brooklyn Borough Gas Co.* v. *Public Service Commission,* P. U. R. 1918F, 335, but the facts of that case are entirely different from those in the case in judgment. In the *Brooklyn Case,* there were three different valuations, one based on the original costs or investment; another upon reproduction upon the average unit prices prevailing from 1912 to 1916, inclusive; and the third upon an official valuation made in 1914 and acquiesced in by the company. The third valuation was selected. As the official valuation had been so recently made, it seems manifest that it was the proper valuation to be adopted.

[9, 10] The opinion of the commission does not state what amount was allowed for operating expenses, nor what per cent on the value fixed it considered a fair and reasonable return on the ascertained valuation. It simply fixed the price of gas per thousand cubic feet to be paid by the consumer. Operating expenses are accruing from day to day, and are determined by the prices of today and not of some future date. In any estimate of rates to be paid by the consumer of gas, it is essential to ascertain the costs of operation, for the gross receipts less the costs of operation is what the gas company gets for its service. "The actual cost of its operation must always be taken into consideration in determining whether or not it receives a fair compensation above that cost." *Brooklyn Borough Gas Case,*

*supra; State Public Utilities Com'r* v. *Springfield Gas & Electric Co., supra.* In 1920 the actual operating expenses of the gas company was $1.668 per thousand cubic feet, and this amount was not called in question by the commission. The highest rate to the consumer was fixed at $1.75 per thousand cubic feet, and the probable average rate at $1.70. This would leave to the gas company only from four to nine cents per thousand cubic feet, which, upon a consumption of a hundred million cubic feet per year, is not a fair compensation for the service furnished. The gas plant was not larger than necessary, and the commission, after fixing the value thereof for rate-making purposes, should have determined the rate of return the company should receive on such valuation and the costs per thousand cubic feet of operation. The aggregate of these two sums, divided by the number of thousand cubic feet of gas to be sold, would give the price to be charged to the consumer. For example, assuming the plant to be valued at $300,000, the return to the company to be ten per cent, and the amount of gas sold to be 100,000,000 cubic feet:

Ten per cent on $300,000 .................... $ 30,000
Cost of producing 100,000,000 cubic feet at $1.66    166,000

$196,000
Cost to consumer per 1,000 cubic feet........    $1.96

These figures are given merely by way of illustration, and are not intended to intimate any opinion upon either valuation or percentage. It is manifest that the commission either did not take into consideration the costs of operation or did not accept the company's estimate of such costs. No suggestion of the latter is found in the opinion of the commission.

[11] For reasons stated by the commission, we do not think that the losses sustained by the gas company prior to its application for an increase of rates should be amortized;

but if, upon further investigation, it is ascertained that a loss has been sustained since that date in consequence of the rate fixed by the commission, such loss should be amortized and spread over such a term of years as will be fair to the gas company and not too burdensome to the consumers.

[12] If in any rate fixed, the gas company should make a profit upon which a tax is imposed, that should be taken into consideration in fixing the per cent of return it is to receive on its investment.

[13] There was evidence before the commission that the service furnished to many customers was of a very inferior character and of no practical value. The regulation of the character of service to be furnished to customers is fully within the powers of the commission, and we shall assume, until the contrary is made to appear, that the commission will exercise that power whenever a proper case is made before it.

[14] In the absence of any statement of facts found by the commission or any tabulation of figures, we are unable to say what rate of charge to the consumer would be fair and reasonable to both the consumer and the gas company, and this case will, therefore, be remanded to the State Corporation Commission, with directions to reconsider the same upon the evidence already before it, and such additional evidence, if any, as it shall permit to be introduced, and to conform its findings to the views hereinbefore expressed; and, in the event of another appeal to this court, to state the facts found by it and to tabulate the figures so as to show clearly how it arrived at its conclusion so far as dependent upon such figures.

*Remanded.*