## ARKANSAS PUBLIC SERVICE COMMISSION et al *v.* CONTINENTAL TELEPHONE COMPANY OF ARKANSAS

77-126                                  561 S.W. 2d 645

Opinion delivered February 20, 1978
(In Banc)

822

*Michael O'Malley* and *C. Richard Lippard,* for appellants.

*Bill Clinton,* Atty. Gen., by: *Ellen G. Brantley,* Asst. Atty. Gen., amicus curiae brief for appellants.

*Tom S. Lovett* and *Steve L. Riggs,* of *House, Holmes & Jewell;Robert A. Helman, Wayne W. Whalen* and *James E. Honkisz,* of *Mayer, Brown & Platt* of Chicago, Ill., for appellee.

JOHN A. FOGLEMAN, Justice. On May 30, 1975, Continental Telephone Company of Arkansas applied to Arkansas Public Service Commission requesting an increase in rates. The commission suspended the rate increase for a period of six months, or until such earlier time as the commission's staff completed its investigation. The rates went into effect, under bond and subject to refund, on November 30, 1975. The City of Booneville had filed a petition on April 21, 1975, requesting an investigation and hearing by the commission on the quality of service being rendered by Continental in that city. On November 14, 1975, the two proceedings were consolidated. Hearings were conducted for four days beginning January 26, 1976.

It was first essential that a rate base be established. Here there was little difference between the company and staff figures. Continental proposed a rate base figure of $31,343,-850, which the staff adjusted to $31,110,358. Continental sought a return between 8.5% and 8.9%. The staff recommended a rate of return of 7.48%. The rate deficiency for which Continental contended was $1,594,072. The staff computed the rate deficiency by "the flow method" at $661,-644 or, alternatively, at $790,905, if the commission per-

mitted the company to use the "normalization" approach.

On May 19, 1976, the commission entered its order denying any rate increase, finding that the service rendered by the company was grossly unsatisfactory, that the company had not provided adequate and efficient service to its patrons and the public, that there had been specific violations of certain special rules of the commission, and that denial of the rate increase would not result in confiscation of Continental's property.

On June 23, 1976, the commission denied Continental's application for a rehearing. Continental then filed its petition to review, set aside and modify the commission's order in the Circuit Court of Pulaski County. On March 1, 1977, that court entered an order remanding the case to the commission, directing the commission to fix just and reasonable rates within a zone of reasonableness ranging from 7.48% to 8.9% and to state its findings of fact in sufficient detail to show how it arrived at its decision.

The commission appealed asserting that the court erred in holding that the commission had exceeded its authority by denying any adjustment in rates, and that, if it did not err in so holding, it did err in finding that the commission must fix rates that would allow the company to earn a return within a zone of reasonable rates, the lower end of which was the increase in revenues recommended by the commission staff. We agree that the case must be remanded to the commission for specific findings of fact, but do not agree with the circuit court's holdings as to the rate increase.

The commission's ultimate findings on the denial of the rate increase were as follows:

> The Commission has reviewed the testimony of both the Company and Staff witnesses in regard to each issue raised.
>
> In finding, as we do, that no increase in rates has been justified, we also find that, under its approved rates, the Applicant will continue to collect sufficient funds with which it can meet all of its operating expenses, including debt service, and provide a return to its stockholders.

The Commission makes this finding after a thorough analysis of the evidence presented on the issue of quality of service which is set forth in detail herein.

The commission did indeed make a detailed resume of the testimony and findings of fact on the quality of service rendered by Continental. There is no contention that this element was not a pertinent factor to be considered on the question of rates.

It is elementary that the rate fixed by the commission must not be so low as to amount to a confiscation of the property of a utility. *City of Fort Smith* v. *Southwestern Bell Telephone Co.*, 220 Ark. 70, 247 S.W. 2d 474. The only effort of the commission to make specific findings on the reasonableness of the rates fixed was:

> The Applicant will continue to be in a position whereby it can pay its operating expenses, interest on its debt and provide a return to its stockholders. Therefore, we find that a denial of this Application will not result in a confiscation of the utility's property.

> On the other hand, if a rate increase is granted even though the evidence shows that the quality of service doesn't meet the adequate and efficient standard, then the new rates will be discriminatory in that the Company will be earning a rate of return which will compensate it in the same manner as other companies who do maintain adequate and efficient service. The subscriber and the public will also be discriminated against in that the customer's property will be confiscated since he is paying for adequate service but in reality receiving debased service which is so poor that he is unable to obtain the full benefits of that for which he is paying.

> This Commission will not shy away and allow a company to increase rates regardless of the quality of service it provides. Rather, we will take a hard line with such companies and fix rates which are just, reasonable and commensurate with the quality of service that it renders.

The foregoing analysis has spelled out this Commission's responsibilities and duties as required by the Arkansas Statutes when considering the issue of adequate and efficient service. Based on the overwhelming evidence found in the record, the Commission therefore finds:

\* \* \*

4. That the just and reasonable rates to be charged by the Company for the commensurate service that it provides should be those rates charged prior to the Company's filing this Application on May 30, 1975. We find that the Application for a rate increase should be denied.

IT IS, THEREFORE, ORDERED:

That the rates and tariffs filed by Applicant on May 30, 1975, be, and the same are rejected. The Application is denied in its entirety.

The pertinent statute required more than this.

On this point Ark. Stat. Ann. § 73-229 (Supp. 1977) states the following requirement:

After the conclusion of any hearing, the Commission shall, within sixty (60) days, make and file its findings and order, with its opinion, if any. Its findings shall be in sufficient detail to enable any court in which any action of the Commission is involved to determine the controverted question presented by the proceeding.

Ark. Stat. Ann. § 73-229.1 (Supp. 1977) governing judicial review provides:

\*\*\* The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. The review shall not be extended further than to determine whether the Commission's findings are so supported by substantial evidence, and whether the Commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws

or Constitution of the United States or of the State of Arkansas. ***

The court must determine, not whether the conclusions of the commission are supported by substantial evidence, but whether its findings of fact are so supported. It is the duty of the commission to fix rates that lie between that which would amount to an overcharge to the public and that which would amount to confiscation of the property of the utility. *City of Ft. Smith* v. *Southwestern Bell Telephone Co.*, supra. Since it is the duty of the courts in determining whether the commission's findings are supported by substantial evidence, and to determine whether the commission's order or decision violates appellee's constitutional rights by fixing a rate which amounts to confiscation of its property (see *City of Ft. Smith* v. *Southwestern Bell Telephone Co.*, supra), the commission's findings must be in sufficient detail to enable the courts to make an adequate and meaningful review. Courts cannot perform the reviewing functions assigned to them in the absence of adequate and complete findings by the commission on all essential elements pertinent to determination of a fair return. *Southwestern Bell Telephone Co.* v. *State Corp. Com'n.*, 192 Kan. 39, 386 P. 2d 515 (1963).

The United States Supreme Court has addressed the problem which the circuit court faced and which confronts us on appeal in *Colorado-Wyoming Gas Co.* v. *Federal Power Com'n.*, 324 U.S. 626, 65 S. Ct. 850, 89 L. Ed. 1235 (1945). In an opinion by Mr. Justice Douglas, that court, in remanding a case for further proceedings because of the generality of findings made by the Federal Power Commission, said:

The review which Congress has provided for these rate orders is limited. Section 19(b) 15 USCA § 717 r(b), 4 FCA title 15, § 717r(b) says that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." But we must first know what the "finding" is before we can give it that conclusive weight. We have repeatedly emphasized the need for clarity and completeness in the basic or essential findings on which administrative orders rest (Citations omitted). Their absence can only clog the administrative function and add to the delays in rate-

making. We cannot dispense with them for Congress has provided the standards for judicial review under this Act. § 19(b). The courts cannot perform the function which Congress assigned to them in absence of adequate findings. ***

The commission has urged that the findings are sufficient because there is evidence from which it could reach the conclusions it stated. But it is not the function of the courts to evaluate the evidence, to draw inferences from it or to read its implications into the statement of the ultimate conclusion. *Petition of New England Tel.&Tel. Co.*, 115 Vt. 494, 66 A. 2d 135 (1949); *Wichita R. R. & Light Co.* v. *Public Utilities Com'n.*, 260 U.S. 48, 43 S. Ct. 51, 67 L. Ed. 124 (1922). The courts are not authorized under a statute like ours to make findings which should have been made by the commission. *Colorado-Wyoming Gas Co.* v. *Federal Power Com'n.*, supra.

There was substantial evidence that the quality of service rendered by Continental, at least in a substantial portion of its service area, left much to be desired, and the commission's findings in that regard are subject to meaningful appellate review. But there is no way that any court could do more than surmise as to the specific factors on which one could conclude that the denial of the application would not result in confiscation of the utility's property. The fact that it can pay current operating expenses (on the quality of service it is presently rendering), interest on its existing debt, and provide a return (what return, we do not know) to its stockholders is not enough.

Confiscation simply means "the taking or seizing of private property to the public use as being forfeited." Webster's New International Dictionary, 2d Ed. In order for rates to be confiscatory, it is not necessary that they be such that the stockholders receive no return and the utility must immediately default on its debt. If the rates ultimately and foreseeably produce this result, the forfeiture is just as complete as it would be if the effect were dramatically instantaneous. If the rates are such that the company cannot finance the improvements necessary to provide the required quality of service or to pay increased operating expense essential to the improvement of service, it is inevitable that con-

fiscation will result and that Continental's certificate of public convenience and necessity will be lost, through surrender or revocation, and awarded to some other telephone company, as one member of the commission has already stated should presently be done. A wound is fatal when death is a predictable consequence, even though it is lingering rather than instantaneous. It is recognized that, although the approval of proposed rate increases is necessarily related to the services offered, a rate that is just and reasonable may be a condition precedent to adequate service. *Village of Apple River* v. *Illinois Commerce Com'n.*, 18 Ill. 2d 518, 165 N.E. 2d 329 (1960). The potential confiscatory effect in such a situation has been considered by the Supreme Court of Ohio in a case where inadequacy of service was a factor. In *Elyria Tel. Co.* v. *Public Utilities Com'n.*, 158 Ohio State 441, 110 N.E. 2d 59 (1953), that court said:

> There is still another aspect to the problem. A utility to survive must receive a fair return on its property. Otherwise capital will not be attracted to furnish the funds for the new equipment needed to meet the demands of increased population and the consequential necessity for increased service. The commission's order as made has the effect of creating serious difficulties for the company. A situation is present where the company needs an increase in rates to attract capital to buy new equipment and to meet increased demands, and the commission says, in effect, "we will give you the new rates to attract the new capital to purchase new equipment when you show that you have installed the new equipment." Adoption of such an attitude would hamstring the utility.

This principle has been recognized by this court when it was held that a utility rate must be reasonable and just for a reasonable time in the future. *City of Ft. Smith* v. *Southwestern Bell Telephone Co.*, supra.

It is a matter of common knowledge that interest rates are comparatively high and that money cannot be borrowed by a concern whose income is not sufficient to provide an adequate fund to service this indebtedness. In considering the question whether rates are confiscatory, current dividends

and prevailing interest rates must be considered not only as they affect current costs but also as they will influence yields for a reasonable time in the future. *Southwestern Bell Telephone Co.* v. *Public Service Com'n.*, 262 U.S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 ALR 807 (1923); *General Telephone Co.* v. *Michigan Public Service Com'n.*, 341 Mich. 620, 67 N.W. 2d 882 (1954). Low income makes for low prices for the securities of the utility and demand for higher interest rates by investors. *Bluefield Waterworks & Improvement Co.* v. *Public Service Com'n.*, 262 U.S. 679, 43 S. Ct. 675, 67 L. Ed. 1176 (1923).

The last general adjustment of appellee's rates was made in April, 1969. It is undisputed that the cost of providing telephone service has increased substantially since that time. The devastating effect of inflation and the increase in interest rates since that time are matters of such common knowledge that any court must take judicial notice of these facts. Cf. *Atchison, Topeka & Santa Fe Railway Co.* v. *United States*, 284 U.S. 248, 52 S. Ct. 146, 76 L. Ed. 2d73 (1932). It is not disputed that appellee's investment in telephone plant increased by 59% during the last five years. There was testimony that between 1969 and March 31, 1975, total gross plant expenditures were $21,376,524 and, by November 30, 1975, had reached $24,490,673. A company witness testified that the single greatest factor contributing to the need for a rate increase was the cost of money, which he said had increased at an unparalleled rate. It was shown that in order to sell a debt issue of $3,000,000 in November, 1975, the company had to pay interest at the rate of 10-7/8%. In addition, the company sold preferred stock at 10-1/8%. A company officer whose principal duty was to supervise the planning, placement and negotiation of debt and equity issues, commercial bank transactions and maintenance of the company's cash position, expressed the opinion that the company is not earning a rate of return sufficient to cover its cost of capital. There was testimony by the executive vice-president of Duff & Phelps, Inc., whose duties were to analyze individual utility companies and their securities and to report on them to investor clients, testified that construction costs had soared to record high levels during the past several years and that the attraction of capital had become a major problem of utilities. There was testimony that the rate increase sought was "absolutely

necessary" if the company is to continut to maintain, expand and improve its telephone service.

It may well be that the present rates are adequate to avoid confiscation of Continental's property, but we are totally deprived of any meaningful appellate review of the commission's basis for so finding.

Continental's application for rehearing aptly points out that the order is "defective in that its failure to make certain specific findings precludes the Applicant or a court on review from analyzing the financial aspects of Applicant's operations, for purposes of determining whether or not the Order constitutes a confiscation of Applicant's property." Continental adds:

> The Order is further defective in that it makes no accompanying finding with respect to Continental's ability to attract capital and maintain its financial integrity or to enable it to raise sufficient capital to make the improvements in service effectively dictated by the Order. Failure to address the issue or procurement of that additional capital, which withholding rate relief until service expenditures are made, constitutes an undue burden on Applicant, confiscation of Applicant's property without due process, and renders the Order defective due to inadequacy of findings on the part of the Commission.

We agree with the circuit court that the commission must fix rates which would allow Continental to earn a return within a zone of reasonableness and, on the record before us, that the zone should be at the lower end of the zone for utilities which provide an inferior grade of service, but not so low as to result in confiscation. We do not agree, however, that the zone of reasonableness lies at some point between the lowest revenue recommended by the commission staff and the revenue sought by Continental. See *State ex rel Utilities Com'n.* v. *General Tel. Co.,* 285 N.C. 671, 208 S.E. 2d 681 (1974). The commission was not bound to accept one or the other of the conflicting views and opinions. *Idaho Power Co.* v. *Thompson,* 19 F. 2d 547 (S.D. Idaho, 1927). To say that the commission is limited by its staff's recommendation as to the rate of return

on the rate base would be to transfer the fact finding function in rate making from the commission to the staff. The staff presentation includes certain adjustments which may or may not be accepted by the commission. Furthermore, the commission may properly reduce the rate deficiency found by its staff because of an inferior quality of service. We find nothing to indicate that either Continental or the commission staff gave any consideration whatever to the quality of service being rendered, in determining the rate deficiency.

In fixing rates, appropriate attention must be given to the ability of the company to attract additional capital as needed. *Cambridge Electric Light Co.* v. *Department of Public Utilities,* 333 Mass. 536, 131 N.E. 2d 922 (1956). See also, *Bluefield Waterworks & Improvement Co.* v. *Public Service Com'n.,* supra; *Southwestern Bell Tel. Co.* v. *State Corp. Com'n.,* 192 Kan. 39, 386 P. 2d 515 (1963). As previously indicated, unless a utility's rate of return is sufficient to make its securities attractive to the public when it is prudently operated, inferior service will result and ultimately, bankruptcy, of the utility. *Petersburg Gas Co.* v. *Petersburg,* 132 Va. 82, 110 S.E. 533, 20 ALR 542 (1922). The rate fixed should allow some surplus for necessary expansion of service and for working capital. *Application of the Diamond State Telephone Co.,* 49 Del. 203, 113 A. 2d 437 (1955); *Idaho Power Co.* v. *Thompson,* supra.

The cost of financing to enable a utility to raise the money necessary for proper discharge of its public duties is an element to be considered in determining whether a rate is confiscatory. *Los Angeles G & E Corp.* v. *Railroad Com'n.,* 289 U.S. 287, 53 S. Ct. 637, 77 L. Ed. 1180 (1933); *Smith* v. *Illinois Bell Telephone Co.,* 282 U.S. 133, 51 S. Ct. 65, 75 L. Ed. 255 (1930); *Riverton Consolidated W. Co.* v. *Pennsylvania Public Utility Com'n.,* 186 Pa. Super. 1, 140 A. 2d 114 (1958). Cost of capital, when properly determined, involves consideration of the financial structure (with appropriate adjustments where financing is from a parent company) of the utility, its credit standing, dividends, interest, regulatory lag, wasting assets and any peculiar features of the particular utility. *Riverton Consolidated W. Co.* v. *Pennsylvania Public Utility Com'n.,* supra. The return to the utility should be sufficient to assure confidence in its financial integrity so as to maintain and support its credit and attract new capital necessary for the proper dis-

charge of its public duty. *Federal Power Com'n. v. Hope Nat. Gas Co.,* 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944); *Petition of Public Service Coordinated Transport,* 5 N.J. 196, 74 A. 2d 580 (1950); *Bluefield Waterworks & Imp. Co. v. Public Service Com'n.,* supra; *Petition of New England Tel. & Tel. Co.,* 115 Vt. 494, 66 A. 2d 135 (1949).

The range of reasonableness in a case where quality of the service is a factor requires a rate no more than the reasonable worth of the service supplied but not so low as to be confiscatory. *Petition of Public Service Coordinated Transport,* supra; *Coal & Coke Ry. Co. v. Conley,* 67 W. Va. 129, 67 S.E. 613 (1910); *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Com'n.,* 19 Ill. 2d 436, 167 N.E. 2d 414 (1960). See also, *Wisconsin Telephone Co. v. Public Service Com'n.,* 232 Wis. 274, 287 N.W. 122 (1939).

In the interest of avoiding multiple appeals, we should consider one other matter raised by appellee, even though it took no cross-appeal from the judgment of the circuit court, probably because the circuit court did not act on the contention by Continental. Continental contends and contended before the circuit court that it was denied constitutional due process of law by the commission's denial of a continuance to permit it to rebut testimony presented to show that it was rendering a poor quality of service.

The commission ordered that its staff and the City of Booneville file their testimony and exhibits on January 21, 1976, five days before the scheduled hearing date. On January 20, 1976, Continental had moved that, following direct testimony of staff witnesses (with the exception of Lee Pigg), and the testimony of public witnesses, the hearing be recessed for 30 days, to permit it to present testimony in rebuttal, or explanation of Pigg's testimony and that of public witnesses. The motion was denied by the commission on January 23, 1976, on the ground that it would not be in the public interest to delay the matter any further. There is nothing in the record to indicate that any of the previous delay was caused by Continental.

Lee Pigg is a member of the commission's staff, who is highly skilled in the field of electronics engineering. He con-

ducted an extensive quality of service study and filed his report just five days before the hearing. He testified that the tests showed electrical faults, such as AC induction, ground noise, central office switching noise, cross-talk and circuit un-stabilization. The weight given the testimony of this witness (perhaps properly), is best described by the statements in the commission's findings that "Pigg's educational background and experience has enabled him to become very knowledgeable of his duties and extremely well qualified to conduct a quality of service study on any phone company in this state" and that "he has testified in a number of proceedings before this commission and when testing procedures have been challenged, the companies have conducted their own tests only to conclude that Mr. Pigg's results were indeed valid." The commission also emphasized the fact that Continental failed to present a witness in its own behalf to show how these tests should have been conducted or the errors in his methodology.

The commission, in weighing the testimony of Pigg, noted that an official of Continental had expressed surprise at the sweeping comments made in Pigg's testimony and his pre-filed report. The commission went on to say that the company failed to produce a rebutting witness, even though the official had stated that company technicians had found Pigg's methods and tests inadequate in number or design and not properly performed; and another witness had said that the company planned to present a witness who would testify that Pigg's notes did not support his report and that there were other tests which should have been performed; that it was admitted that Pigg had furnished the company copies of his notes; that the company had assigned an individual familiar with the locale and knowledgeable about at least some of the tests, to accompany Pigg when he made the tests. The commission stated that the company had ample opportunity to become aware of Pigg's findings before his report was filed (apparently because of the receipt of the field notes) and to prepare testimony in response, but chose not to present testimony in rebuttal of the contents of the report or to show why the field notes did not support his report. The commission pointed out that Pigg testified that when his report was submitted he had to assume that the company had a

problem, but that it was hard for him to distinguish what the problem was.

It is obvious to us that the entire field covered by Pigg is a highly technical and sophisticated one, as is the whole process of rate making. Pigg testified that the commission did not have the type of equipment required to make certain measurements about which he was asked on cross-examination.

The weight the commission gave to the testimony of 30 public witnesses, who testified on the quality of service on the last day of the hearing, is illustrated by its statement that the testimony was so substantial and condemning that it bore repetition in the order. The repetition took nearly one-half of the extensive rate order entered. There is no indication that appellee had any knowledge of the identity of the witnesses or of the gist of their testimony before they testified. Continental's petition for rehearing, denied by the commission, reiterated its contention that the denial of the opportunity to investigate and respond to the staff testimony, as well as to hearsay and vague charges concerning the quality of its service, constituted a denial of due process of law.

We do not find the testimony of some of these witnesses to be so vague as to categorize all of it as being so. We do observe, however, that much of it is the rankest sort of hearsay and much of it is hearsay upon hearsay. It is true, as the commission points out, that no objection was made to this testimony by appellee and that the commission is not bound by strict rules of evidence. See Ark. Stat. Ann. § 73-127 (Repl. 1957). But Continental did not ask that the testimony be excluded. It only asked an opportunity for rebuttal.

In rate-fixing cases, the hearing required partakes of the nature of and embraces the scope and incidents of a judicial hearing. The character of the proceeding to determine the reasonableness of rates has been appropriately described by the United States Supreme Court in *Morgan v. U.S.*, 298 U.S. 468, 56 S. Ct. 906, 80 L. Ed. 1288 (1936), viz:

A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon

the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of a *quasi judicial* character. The requirement of a "full hearing" has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The "hearing" is designed to afford the safeguard that the one who decides shall be found in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. The "hearing" is the hearing of evidence and argument. ***

In such a proceeding, due process must be preserved to all whose legal rights are involved and concluded by the ultimate determination. *Alabama Power Co.* v. *Fort Payne,* 237 Ala. 459, 187 So. 632, 123 ALR 1337 (1939). A full and fair hearing is a fundamental requirement of due process in the determination of the reasonableness of rates. *Shields* v. *Utah Idaho Central R. Co.,* 305 U.S. 177, 59 S. Ct. 160, 83 L. Ed. 111 (1938); *Atchison, Topeka & Santa Fe Railway Co.* v. *U.S.,* 284 U.S. 248, 52 S. Ct. 146, 76 L. Ed. 273 (1932). The opportunity to submit evidence to rebut charges or adverse claims and testimony is an essential requirement of a full or fair hearing. *Federal Trade Com'n.* v. *National Lead Co.,* 352 U.S. 419, 77 S. Ct. 502, 1 L. Ed. 2d 438 (1957); *U.S.* v. *Storer Broadcasting Co.,* 351 U.S. 192, 76 S. Ct. 763, 100 L. Ed. 1081 (1956). See also, *Interstate Commerce Com'n.* v. *Louisville & N. R. Co.,* 227 U.S. 88, 33 S. Ct. 185, 57 L. Ed. 431 (1913). To meet due process requirements a hearing must afford a utility the right to reasonably know the charges and the right to meet such charges by competent evidence. *Mayfield Gas Co.* v. *Public Service Com'n.,* 259 S.W. 2d 8 (Ky., 1953). Where reliance is placed by an administrative agency upon testimony of certain witnesses in making a critical factual determination, it will be an abuse of discretion to fail to hear material evidence which might impeach, not only the testimony, but the findings made by the agency as well. *National Labor Relations Board* v. *Indiana & Michigan Electric Co.,* 318 U.S. 9, 63 S. Ct. 394, 87 L. Ed. 579 (1943). The more liberal the practice in admitting testimony, the more imperative is the obligation to preserve

the essential rules by which rights are asserted or defended. *Interstate Commerce Com'n. v. Louisville & N. R. Co.,* supra; *Alabama Power Co. v. Fort Payne,* supra.

The commission must necessarily have a wide latitude of discretion in conducting and expediting the many hearings it must hold. Fundamental fairness requires, however, that, where expert or technical testimony is essential to a proper response to testimony adverse to it, adequate opportunity must be given to present testimony in rebuttal. *In re St. Joseph Lead Co.,* 352 S.W. 2d 656 (Mo., 1961). See also, *Interstate Commerce Com'n. v. Louisville & N.R. Co.,* supra; *Simmons v. United States,* 348 U.S. 397, 75 S. Ct. 397, 99 L. Ed. 453 (1955).

When a tribunal is vested with a great latitude of discretion, considerable judicial restraint should be observed in finding abuse of that discretion. It is with some reluctance that we conclude that the commission should, upon remand, give appellee a reasonable time within which to present evidence to rebut, impeach, or detract from, the testimony on the quality of its service.

The judgment of the circuit court, insofar as the remand of the case is concerned, is affirmed as modified to eliminate its holding as to the lower limit on the zone of reasonableness and upon remand, further proceedings of the commission shall be consistent with this opinion.

GEORGE ROSE SMITH and HICKMAN, JJ., would affirm the commission's order.