*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0219P (6th Cir.)
File Name: 01a0219p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

Nos. 00-2087/2173
MICHIGAN BELL TELEPHONE
COMPANY, d/b/a AMERITECH
MICHIGAN,
    *Plaintiff-Appellant/*
        *Cross-Appellee,*

    *v.*

JOHN ENGLER, in his Official
Capacity as Governor of the
State of Michigan; DAVID A.
SVANDA, in his Official
Capacity as Commissioner of
the Michigan Public Service
Commission; ROBERT B.
NELSON, in his Official
Capacity as Commissioner of
the Michigan Public Service
Commission; JOHN G.
STRAND, in his Official
Capacity as Chairman of the
Michigan Public Service
Commission,
    *Defendants-Appellees/*
        *Cross-Appellants.*

Nos. 00-2087/
2088/2173/2174

1

Nos. 00-2088/2174

VERIZON NORTH
INCORPORATED and CONTEL
OF THE SOUTH,
INCORPORATED, d/b/a GTE
SYSTEMS OF MICHIGAN,
          *Plaintiffs-Appellants/*
              *Cross-Appellees,*
          v.
JOHN ENGLER, in his Official
Capacity as Governor of the
State of Michigan; DAVID A.
SVANDA, in his Official
Capacity as Commissioner of
the Michigan Public Service
Commission; ROBERT B.
NELSON, in his Official
Capacity as Commissioner of
the Michigan Public Service
Commission; JOHN G.
STRAND, in his Official
Capacity as Chairman of the
Michigan Public Service
Commission; JENNIFER M.
GRANHOLM, in her Official
Capacity as Attorney General
of the State of Michigan
(00-2174),
          *Defendants-Appellees/*
              *Cross-Appellants.*

may befall them outweighs any potential harm to the State of Michigan, and more importantly, to their own subscribers. Accordingly, a preliminary injunction against enforcement of MTA §§310(7) and 701, respectively, is warranted. *See Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir.1982).

## III. CONCLUSION

For the foregoing reasons, the decision of the district court to enjoin MTA §701 is **AFFIRMED**, and the district court's denial of plaintiffs' motion to enjoin MTA §310(7) is **REVERSED**. Accordingly, this matter is **REMANDED** to the district court for further proceedings.

Appeal from the United States District Court for the Eastern District of Michigan at Detroit. Nos. 00-73207; 00-73208—Paul D. Borman, District Judge.

Argued: May 4, 2001

Decided and Filed: July 13, 2001

Before: JONES and DAUGHTREY, Circuit Judges; ECONOMUS, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Michael K. Kellogg, KELLOGG, HUBER, HANSEN, TODD & EVANS, Washington, D.C., Patrick F. Philbin, KIRKLAND & ELLIS, Washington, D.C., for Appellants. David A. Voges, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Michael K. Kellogg, Sean A. Lev, Mark Lewis Evans, KELLOGG, HUBER, HANSEN, TODD & EVANS, Washington, D.C., Patrick F. Philbin, Andrew B. Clubok, Matthew T. Henderson, KIRKLAND & ELLIS, Washington, D.C., Jeffery V. Stuckey, Peter H. Ellsworth, DICKINSON, WRIGHT, MOON, VAN DUSEN & FREEMAN, Lansing, Michigan, for Appellants. David A. Voges, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, Patricia S. Barone, MICHIGAN ATTORNEY GENERAL, PUBLIC SERVICE DIVISION, Lansing, Michigan, for Appellees. Roderick S. Coy, Thomas E. Maier, CLARK HILL PLC, Okemos, Michigan, for Amicus Curiae.

---

[*] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

———————

**OPINION**

———————

PETER C. ECONOMUS, District Judge.   Plaintiffs, Michigan Bell Telephone Company, d/b/a Ameritech Michigan and Verizon North, Incorporated (collectively "plaintiffs"), appeal the district court's order denying their request for a preliminary injunction of §310(7) of the Michigan Telecommunications Act of 2000 ("MTA"). MTA §310(7) abolished a fee imposed upon customers known as the end user common line charge ("EUCL"). Defendants, John Engler, Governor of the State of Michigan, and David A. Svanda, Robert B. Nelson and John G. Strand, Commissioners of the Michigan Public Service Commission ("MPSC"), cross-appeal the district court's order enjoining another provision of the MTA, §710, which froze regulated telephone rates at their May 1, 2000 level until December 31, 2003, except for services the MPSC deemed competitive. The provisions of the MTA at issue applied only to telephone service providers with more than 250,000 subscribers – namely the plaintiffs.

For the following reasons, we **AFFIRM** the district court's order preliminarily enjoining MTA §701, and **REVERSE** the district court's denial of the plaintiffs' motion for enjoinment of MTA §310(7).

## I. FACTS AND PROCEDURAL BACKGROUND

Plaintiffs each provide local telephone service to over 250,000 customers in the State of Michigan.  Together, the plaintiffs supply over 90% of the local telephone service in the State.   Thirty-six other companies account for the remainder of local telephone service, but none of them has more than 250,000 subscribers.

The plaintiffs charge their Michigan customers a monthly fee for "local exchange service."   This service includes a

If lawful and reasonable rates fixed by the commission are as great or greater than those established and collected by the company . . . no refunds will be required; however, if the commission shall fix and determine rates which are lower than the [] rates collected by the company, and said rates fixed by the commission are lawful, reasonable and nonconfiscatory, then the difference between the rates collected by the company . . . and said rates prescribed by the commission shall be refunded to the company's customers.

*Id.   See also Michigan Consolidated Gas Company v. Michigan Public Service Commission*, 209 N.W.2d 210,215-217 (Mich.1973); *Consumers Power Company v. Michigan Public Service Commission*, 327 N.W.2d 875, 881-82 (Mich.1982).   Consequently, if the State ultimately prevails in this action, the plaintiffs may be required to issue refunds of the EUCL charges collected, and/or rates collected above a lawfully established level.   As such, the ability of the plaintiffs to issue refunds substantially diminishes the harm that may befall their subscribers if an injunction is granted, and is outweighed by the harm that may befall the plaintiffs.

Finally, we must determine whether the issuance of an injunction will serve the public interest.   The plaintiffs have made a showing that there is a substantial likelihood that MTA §§701 and 310(7), respectively, are unconstitutional insofar as each statute fails to provide adequate safeguards against confiscatory rates.   As such, the public interest would be served by the enjoinment of each of the challenged sections of the MTA.   *See Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d 1390, 1400 (6th Cir.1987) (recognizing that "the public is certainly interested in the prevention of enforcement of ordinances which may be unconstitutional").

In summary, the plaintiffs have presented a serious question as to the constitutionality of the challenged provisions of the MTA, and have demonstrated that the irreparable harm which

Although the plaintiffs may recoup their losses by raising rates, and consequently would not suffer irreparable financial harm, there are other forms of irreparable harm which may befall them if the court does not enjoin enforcement of MTA §§701 and 310(7), respectively, *pendent lite*. The plaintiffs assert that they will lose customer good will if they are forced to recoup losses by substantially raising rates and fees for the period during which this action may be litigated. This court has held that even if higher rates and fees do not drive customers away, loss of established goodwill may irreparably harm a company. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir.1992) (Because "damages flowing from such losses [of customer goodwill] are difficult to compute," that loss too "amounts to irreparable injury"); *see also Gateway E. Ry. Co. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140 (7th Cir.1994) ("[S]howing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages"). There is sufficient evidence in the record to support a finding that the plaintiffs will be irreparably harmed if they are compelled to recoup their substantial projected losses through increased rates and fees.

Of course, we must balance the harms which the plaintiffs may suffer against those which plaintiffs' subscribers may suffer if MTA §§701 and 310(7), respectively, are enjoined. The plaintiffs assert that if the challenged portions of the MTA are ultimately declared unconstitutional, they will provide refunds to their subscribers with interest. In *General Telephone Company of Michigan v. Michigan Public Service Commission*, 67 N.W.2d 882 (Mich.1954), the court declared that it was a proper exercise of the trial court's equity jurisdiction "to protect the company from confiscatory rates" by allowing the company to collect higher rates while the MPSC considered the necessity for the requested rate increase. *Id*. at 888. In doing so, the Michigan Supreme Court approved of the trial court's order that the telephone company establish a trust fund from which refunds could be paid to its subscribers. The Michigan Supreme Court quoted the trial court's reasoning with approval:

certain number of "local" telephone calls which originate and terminate within a defined calling area. The plaintiffs also offer "local toll service," which covers calls not defined as either local or long distance. The plaintiffs charge customers on a per-minute basis for local toll calls.

The plaintiffs also charge their customers other fees, two of which are the *inter*state end user common line charge (presently $4.35) and the *intra*state end user common line charge. Verizon imposes an intrastate EUCL monthly charge of $3.50, and Ameritech imposes a $3.28 monthly intrastate EUCL charge. Further, prior to the enactment of MTA §310(7), the plaintiffs could impose, or increase at any time, the intrastate EUCL charge without prior approval of the MPSC, or a hearing before that body. The only limitation on the intrastate EUCL charge is that it must remain below the interstate EUCL rate set by the Federal Communications Commission ("FCC").

On July 17, 2000, Act 295 of the Public Acts of the State of Michigan for 2000 was signed by Governor John Engler, and took immediate effect. Act 295 amended the MTA to ensure that "every person has access to just, reasonable, and affordable basic residential telecommunication service," and to "allow and encourage competition [in] providing telecommunication services." Mich. Comp. Laws §484.2101(2)(a), (b). As stated previously, two provisions of Act 295 are at issue herein – §310(7) and §701: §310(7) abolishes the intrastate EUCL; and, §701 freezes telephone rates for service providers with more than 250,000 subscribers until December 31, 2001, unless a provider's services are deemed competitive by the MPSC in various circumstances.

In the proceedings before the district court, the plaintiffs argued, *inter alia*, that MTA §§310(7) and 701(1) violate the Due Process Clause of the Fourteenth Amendment. The plaintiffs assert that these provisions are facially unconstitutional because they do not provide a mechanism

through which telephone service providers may ensure that they receive a just and reasonable rate of return on their investment. As noted above, the district court denied the plaintiffs' motion for preliminary injunction with respect to MTA §310(7), and granted it with respect to §701. On September 22, 2000, the plaintiffs filed a notice of appeal of the district court's order and simultaneously moved this court for an emergency injunction of MTA §310(7). On September 28, 2000, Chief Judge Martin granted the plaintiffs' emergency motion.

## II.  LAW

### A.  Severability

As an initial matter, the court must determine whether MTA §701, the rate freeze provision, may be severed from §310(7) which abolishes the EUCL. The plaintiffs argue that the two provisions may not be severed, and, therefore, the district court should have enjoined both statutory provisions. Michigan's severability statute provides:

> If any portion of an act or the application thereof to any person or circumstances shall be found to be invalid by a court, such invalidity shall not affect the remaining portions or applications of the act which can be given effect without the invalid portion or application, provided such remaining portions are not determined by the court to be inoperable, and to this end acts are declared to be severable.

Mich. Comp. Laws §8.5. The Michigan Supreme Court explained the operation of an identical provision in another statute as follows:

> Relying on the Act's severability clause, §18, defendants maintain that the Legislature expressly intended to preserve as much of the Act as possible. This clause provides: 'Sec. 18. If any portion of this act or the application of this act to any person or circumstance is

Commission to alter or readjust rates or charges retroactively. Indeed, the Supreme Court found that the Commission's statutory authority to fix utility rates was 'quite clearly prospective only.' . . . In this proceeding, however, *Ameritech Michigan's effort to rebill the IXCs is not based on a Commission order that retroactively affects Ameritech Michigan's rates, but upon a statutory provision* that expressly precludes enforcement of the 55% discount ordered by the Commission until July 1, 1997. In passing Section 312b, the Legislature was aware of the Commission's prior orders. Indeed, in Section 312(b)(4), the Legislature made reference to those orders. *Accordingly, the Commission does not agree that the prohibition against retroactive ratemaking, which is grounded on interpretation of the Commission's statutory ratemaking authority, should be applied to this situation.* Ameritech Michigan's right to recover the undiscounted amount for access charges between July 26, 1996 and June 30, 1997 is based upon an act of the Legislature that the Supreme Court has determined controls the outcome of this proceeding. *Therefore, the Commission agrees with Ameritech Michigan that the Supreme Court's decision precludes application of the prohibition against retroactive ratemaking to those proceeding* because the Supreme Court has determined that the Commission's imposition of a 55% discount in access charges for Ameritech Michigan's customers between July 26, 1996 and June 30, 1997 was unlawful.

*MCI Telecommunications Corp. v. Ameritech*, 2000 WL 19111388, at *6 (Mich.P.S.C. Dec. 4, 2000) (No. U-10138, U-11743) (citation omitted) (emphasis added). Because the Michigan Legislature abolished the EUCL and froze rates by statute, the MPSC is not precluded from setting a retroactive rate which allows the plaintiffs to recoup losses caused by enforcement of the statutory provisions. Accordingly, the plaintiffs' argument that the retroactive rate-making doctrine applies to this case is without merit.

p. 632, 67 N.W.2d 882[6] Thus, had the preliminary injunction not issued, and had the company prevailed in the trial of this cause, the latter would have achieved a hollow victory indeed since there would have been no legal avenue open to the company by which to recoup its financial losses. We think this case presents a classic example of a situation in which a party will suffer 'irreparable harm' in the event that a preliminary injunction is not issued."

*Id*. at 217 (*quoting* appellate court case of the same name, 181 N.W.2d 596, 698 (Mich. Ct. App.1970)).

The cases discussed above stand only for the proposition that the MPSC may not adjust past rates by establishing retroactive rates. This proposition inheres from the Michigan Supreme Court's determination in *Michigan Bell*, *supra*, that the MPSC's "lawfully established rate remains in force until altered by a subsequently lawful rate." 24 N.W.2d at 204. Therefore, based upon *Michigan Bell*, and the cases which follow it, the MPSC may not impose retroactive rates affecting its established rates. However, there is no prohibition on retroactive rate-making where rates have been established *statutorily*. Ameritech agreed with this interpretation in a recent case before the MPSC:

In *Michigan Bell*, *supra*, the Supreme Court grounded its decision on the fact that there was no express or reasonably implied statutory provision authorizing the

---

[6]In *General Telephone Company of Michigan v. Michigan Public Service Commission*, 67 N.W.2d 882 (Mich.1954), the court addressed the MPSC's order granting a rate increase smaller than the utility company's request and a Michigan circuit court's subsequent decree ordering a temporary increase in rates above the MPSC's determination. In addressing an argument concerning the MPSC's delay in considering facts relevant to the rate determination, the court remarked: "This Court made it very clear in *Michigan Bell*, [*supra*], that the commission cannot establish a retroactive rate thereby correcting injustice caused by delay in establishing rates for the past." *Id.* at 887.

found to be invalid by a court, the invalidity shall not affect the remaining portions or applications of this act which can be given effect without the invalid portion or application, if the remaining portions are not determined by the court to be inoperable.' The doctrine of severability holds that statutes should be interpreted to sustain their constitutionality when it is possible to do so. Whenever a reviewing court may sustain an enactment by proper construction, it will uphold the parts which are separable from the repugnant provisions. To be capable of separate enforcement, the valid portion of the statute must be independent of the invalid sections, forming a complete act within itself. After separation of the valid parts of the enactment, the law enforced must be reasonable in view of the Act as originally drafted. One test applied is whether the law-making body would have passed the statute had it been aware that portions therein would be declared to be invalid and, consequently, excised from the Act.

*Pletz v. Austin*, 336 N.W.2d 789, 809 (Mich.1983) (footnotes omitted). The plaintiffs contend that the Michigan Legislature coupled the EUCL abolishment with the rate freeze to give subscribers rate relief, and thus, severing one from the other will defeat the purpose of enacting two provisions. Contrary to the plaintiffs' position, enjoinment of MTA §701 does not render the remainder of the statute inoperable. Severance will give the statute its intended purpose – rate relief in the form of EUCL abolishment – although to a lesser extent. Telephone service providers must still apply for a rate increase, and the relevant authorities may treat such applications with the intention of protecting consumers from excessive rates. Accordingly, the plaintiffs' argument lacks merit, and MTA §701 may be enjoined with no affect on §310(7).

## B. Standard of Review

The court reviews the grant or denial of a preliminary injunction for an abuse of discretion. Accordingly, this court will not disturb a district court's findings of fact unless clearly erroneous, but reviews a district court's legal conclusions *de novo*. *See Southwest Williamson County v. Slater*, 243 F.3d 270, 277 (6th Cir.2001) (*citing Sandison v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 1026, 1030 (6th Cir.1995)).

A district court must consider four factors in determining whether to issue a preliminary injunction. The district court must consider: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Slater*, 243 F.3d at 277 (*quoting McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir.1995)). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Six Clinics Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir.1997) (*citing Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994)). "No single factor will be determinative as to the appropriateness of equitable relief, . . . and the district court's weighing and balancing of the equities is overruled 'only in the rarest of cases.'" *Id.* (internal quotation marks and citations omitted). Finally, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Id.*

## C. Constitutionality of Challenged Provisions

### 1. Likelihood of Success on the Merits

By enacting Act 295, the State of Michigan sought to control intrastate telephone rates charged by Ameritech Michigan and Verizon. Courts have long held that State

earnings. Instead the commission's rate-fixing orders are effective only prospectively.

*Id.* at 206. The court's holding was based on the following proposition: "[O]rderly protection of the rights of the parties concerned requires the holding in law that a lawfully established rate remains in force until altered by a substantially lawful rate." *Id.* at 204. Therefore, the MPSC's authority in fixing rates is only prospective, and it may not impose a retroactive rate where the previous rates were lawfully established and imposed.

The plaintiffs and the district court incorrectly relied upon *Michigan Consolidated Gas Company v. Michigan Public Service Commission*, 209 N.W.2d 210 (Mich.1973), for their conclusion that the plaintiffs could not recoup their losses if the statutes remained in effect during the litigation. In *Michigan Consolidated Gas*, the plaintiff utility company had petitioned for a rate increase, and the MPSC granted one which was smaller than that requested by the company. A Michigan circuit court, upon review, issued a temporary injunction granting a rate increase in addition to that granted by the MPSC. The Michigan Court of Appeals affirmed the circuit court's ruling, and the State appealed to the Michigan Supreme Court. In its summary statement affirming the lower court's judgment, the court quoted with approval the following passage from the Michigan Court of Appeals:

"Our Supreme Court has explicitly held that a commission may not establish retroactive rates thereby correcting any injustice caused by a delay in establishing necessary increased rates. *Michigan Bell Telephone Co. v. Public Service Commission* (1946), 315 Mich. 533, 24 N.W.2d 200; *General Telephone Company of Michigan v. Public Service Commission*, *Supra*, 341 Mich. At

### 2.  Balance of Hardships and Public Interest

The plaintiffs assert that they would be unable to recoup any losses incurred as a result of the abolishment of the EUCL pursuant to MTA §310(7), and the rate freeze imposed by §701.  They assert that the "retroactive rate-making doctrine" bars any recoupment of their losses.  The plaintiffs' argument is without merit.

The Michigan Supreme Court first discussed the retroactive rate-making doctrine in *Michigan Bell Telephone Co. v. Michigan Public Service Commission*, 24 N.W.2d 200 (Mich.1946).  In *Michigan Bell Telephone*, the plaintiff telephone company challenged the MPSC's order to the company to reduce gross revenues for the previous year by making *pro rata* refunds to its subscribers.  The court stated the issue in the case as follows:

> Has the commission statutory power to order retroactively a refund to be made by the telephone company to its subscribers out of charges for services rendered (and in large part paid prior to the date of the order), such charges having been made in conformity with the existing rates fixed by the commission (or its predecessor) and in effect during the time the services were rendered?

*Id*. at 202.  After reviewing Michigan law, the court concluded that "[t]here is no express or reasonably implied statutory provision authorizing the commission to alter or readjust telephone rates or charges retroactively." *Id*. at 205.  Therefore, the court held

> [T]he commission has only such power relative to fixing the rates or earnings of the telephone company as are by statute expressly or by necessary implication vested in it.  Under such rule we cannot find that the commission has either express or implied statutory authority to retroactively reduce appellee's rates or its accrued

imposed regulatory price controls are constitutional within certain limits.  Pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, "[p]rice control is 'unconstitutional . . . if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt . . . .'" *In Re Permian Basin Area Rate Cases*, 390 U.S. 747, 769-70 (1968) (*quoting Nebbia v. People of State of New York*, 291 U.S. 502, 539 (1934)) (emphasis in original).  Rates enacted by the State must be just and reasonable.  *See id*. at 770 (*citing Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586 (1942)).  "Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid . . . ." *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 605 (1944).  *See also Calfarm Insurance Co. v. Deukmejian*, 771 P.2d 1247, 1254 (Cal.1989) ("The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable rate of return on the value of the property used at the time that it is being used for the public service. . . .").  Therefore, "the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." *Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989) (*citing Covington & Lexington Turnpike Road Co. v. Sandford*, 164 U.S. 578, 597 (1896); *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585 (1942); *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 391-92 (1974)); *see also Oklahoma Natural Gas Co. v. Russell*, 261 U.S. 290, 293 (1923) (holding that the plaintiff utility company deserved a remedy for confiscatory rates); *Prendergast v. New York Telephone Co.*, 262 U.S. 43, 49 (1923) (same); *Pacific Telephone & Telegraph Co. v. Kuykendall*, 265 U.S. 196, 204-05 (1924) (same); *Banton v. Belt Line Railway Corp.*, 268 U.S. 413, 417 (1925) (same).

The Due Process Clause requires a mechanism through which a regulated utility may challenge the imposition of rates

which may be confiscatory. *See Calfarm, supra*; *Guaranty Nat'l Ins. Co. v. Gates*, 916 F.2d 508 (9th Cir.1990); *State Farm Mut. Auto Ins. Co. v. New Jersey*, 590 A.2d 191 (N.J.1991). The question, then, is whether the MTA adequately safeguards against confiscatory rates, and therefore, ensures a constitutional rate of return.

MTA §701, prohibits any rate increase for every "telecommunication service" offered to subscribers for more than three years, between May 1, 2000, and December 31, 2003, with two exceptions.[1] Rate relief may be obtained: (1) where, pursuant to MTA §310(4), a service provider serves fewer than 250,000 subscribers; and (2) where services are determined to be competitive pursuant to MTA §701(3). The first is inapplicable to the plaintiffs herein, and the second is constitutionally inadequate.

The competitive opt-out provision contained in MTA §701(3), on its face, fails in four respects. First, it does not address the reasonableness of currently regulated rates. Second, the mere possibility that regulated rates may become competitive does not reduce or eliminate the possibility that such rates are confiscatory. Next, the opt-out provision fails

---

[1]The relevant provisions of MTA §701 state:

(1) Notwithstanding any other provision of this act and except as allowed by section 304(1) or for services determined to be competitive under subsection (3) and for rates charged under contract, the rate charged for every telecommunication service provided to an end-user in this state shall be no higher than the rate charged for the service as of May 1, 2000. . . .

(3) The rates determined under this section shall remain in effect for each service until December 31, 2003, or until the commission determines that a service is competitive for an identifiable class or group of customers in an exchange, group of exchanges, or other clearly defined geographical area, whichever is earlier.

not consider the need for a return on investment which the above-discussed precedent requires. Consequently, MTA §304(7)(d) does not adequately safeguard against confiscatory rates.

With respect to §304(7)(e), the district court reasoned that "[i]n order for a provider's investment in the local exchange network to be 'economically justifiable,' . . . it must be sufficient to cover costs and to service both debt and equity investments in the company. That is the essence of economic justification." (JA, 57.) The district court does not cite to any authority in support of this proposition. Considering the inadequacy of the definition of "just and reasonable" contained in MTA §304(1) discussed by the court *ante*, it may be inferred that an "economically justifiable" rate is one which merely covers the increased cost of providing local exchange service.[5] As we previously stated, merely providing for a return which only covers costs is inadequate under well-established due process standards. Absent any indication that the Michigan Legislature intended to define an "economically justifiable" rate to ensure a rate of return which comports with due process, the court cannot conclude that MTA §304(7)(e) provides an adequate safeguard against confiscatory rates.

In sum, MTA §701 freezes telephone rates, and §310(7) abolishes the EUCL without providing a mechanism to safeguard the right to earn a constitutional rate of return. Accordingly, the plaintiffs' have demonstrated a substantial likelihood of demonstrating that MTA §§701 and 310(7), respectively, are unconstitutional.

---

[5]The court also notes that in addition to the constitutional inadequacy of MTA §304(7)(e) with respect to defining an "economically justifiable" rate, it only provides for increased rates in areas where telephone service providers wish to invest in new infrastructure. It does not address the need to increase rates in other geographic areas where rates may be confiscatory whether or not telephone service providers have proposed, begun, or completed new infrastructure investment.

The district court also erroneously determined that MTA §304(7) provides adequate safeguards against confiscatory rates. MTA §304(7) states:

In reviewing a rate alteration under subsection (6), the [MPSC] shall consider only one or more of the following factors if relevant to the rate alteration as specified by the provider:

(a) Total service long run incremental cost of basic local exchange services.

(b) Comparison of the proposed rate to the rates charged by other providers in this state for the same service.

(c) Whether a new function, feature, or capability is being offered as a component of basic local exchange service.

(d) Whether there has been an increase in the costs to provide basic local exchange service in the geographic area of the proposed rate.

(e) Whether the provider's further investment in the network infrastructure of the geographic area of the proposed rate is economically justifiable without the proposed rate.

Mich. Comp. Laws §484.2304(7). The district court determined that the last two factors adequately protected plaintiffs' right to an adequate rate of return.

MTA §304(7)(d) does not guarantee telephone service providers a constitutional rate of return. On its face, it merely provides for a rate increase to cover the *cost* of providing service in a geographic area. Under MTA §304(7)(d), the plaintiffs again may be required to subsidize rates in certain geographic areas with rates in other areas, or with revenues collected from other unregulated lines of business. Furthermore, the statute's provision for increased costs does

to provide for timely relief from confiscatory rates.[2] Finally, although the plaintiffs have other unregulated income streams, they are not required to subsidize their regulated services with income from rates either deemed to be competitive, or with revenues generated from unregulated services. *See Brooks Scanlon Co. v. Railroad Commission*, 251 U.S. 396 (1920); *Calfarm*, 771 P.2d at 1254. Therefore, under MTA §701 if the plaintiffs' rates became competitive in Michigan's 734 area code, but were not competitive in the 810 area code (and thus remained frozen), they cannot be forced to subsidize the frozen rates with revenue from the competitive rates, or from other unregulated service which they offer. In sum, MTA §701 does not include any provisions which adequately safeguard against imposition of confiscatory rates.

Although MTA §701 does not contain adequate safeguards, other provisions of the MTA arguably attempt to ensure the plaintiffs receive a constitutional rate of return. MTA §304(1) provides that "the rates for basic local exchange service shall be just and reasonable," it defines "reasonable rate," or "just and reasonable rate," as "a rate that is not inadequate, excessive, or unreasonably discriminatory. A rate is inadequate if it is less than the total service long run incremental cost of providing the service [TSLRIC]." *See id*. §484.2102(y). The plaintiffs argue that the statutory definition of a "just and reasonable rate" contained in MTA §304(1) does not pass constitutional muster. The court agrees. The definition contained in MTA §304(1) clearly does not guarantee a constitutionally adequate rate of return for regulated telephone service providers because it merely permits telephone service providers to cover *costs*, and does

---

[2] The court need not address the timing of rate relief – that is, whether the plaintiffs are entitled to a pre- or post-deprivation hearing on a rate reduction – for the purpose of this facial challenge at the preliminary injunction stage.

not ensure a fair and reasonable rate of return on investment. *See In Re Permian Basin*, *supra*.

Moreover, the Ninth Circuit in *Guaranty National Insurance Co. v. Gates*, 916 F.2d 508 (1990), addressed the constitutionality of a Nevada insurance statute similar to MTA §304(1) in its definition of an "inadequate" rate. Section 686B.050(3) of the Nevada Revised Statutes stated, "[r]ates are inadequate if they are clearly insufficient, together with the income from investments attributable to them, to sustain projected losses and expenses in the class of business of which they apply." *Id*. at 515. The Nevada statute essentially preserved insurance companies' ability to recoup the costs of their services. The Ninth Circuit held that although the Nevada statute guaranteed that insurers would "break even . . . it does not guarantee the constitutionally required 'fair and reasonable return.'"[3] *Id*. (*citing Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) ("[T]he fixing of 'just and reasonable' rates, involves a balancing of the investor and consumer interests . . . . [T]he investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view, it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include the service of the debt and the dividends on the stock")). Pursuant to the reasoning set forth in *Guaranty National*, *supra*, the MTA's definition of a "just and reasonable rate" does not guarantee the constitutionally-required fair and reasonable rate of return.[4]

---

[3] Importantly, the court also held that "[n]either [the statute] nor the Nevada Insurance Code of which it [was] a part provide[d] any mechanism to guarantee a constitutionally fair and reasonable return." *Id*. at 512.

[4] Although the district court may be correct in its determination that there is no limit on the MPSC's authority to set rates "anywhere within the range from inadequate on the one hand to excessive on the other," it

Furthermore, the TSLRIC-based definition of an inadequate rate which the district court relied upon does not ensure that telephone service providers receive a constitutionally fair and reasonable rate of return. The Michigan Legislature has defined TSLRIC as follows:

Total service long run incremental costs means, given current service demand, including associated costs of every component necessary to provide the service, 1 of the following:

(i) The total forward-looking cost of a telecommunication service, relevant group of service, or basic network component, using current least cost technology that would be required if the provider had never offered the service.

(ii) The total cost that the provider would incur if the provider were to initially offer the service, group of service, or basic network component.

Mich. Comp. Laws §484.2102(ff). On its face, §484.2102(ff) sets the TSLRIC at a level which only accounts for the *cost* of providing services. Under the definition set forth in MTA §304(1), a rate would only be inadequate if it was set below the cost incurred by the service provider. This clearly does not satisfy the constitutional standard set forth above because it merely ensures cost recovery without guaranteeing a fair and reasonable rate of return on investment. *See Guaranty National*, *supra*, at 515. In sum, MTA §304(1) does not define a "just and reasonable" rate in a manner which guarantees plaintiffs an adequate rate of return on their investment.

---

is axiomatic that due process guarantees a fair and reasonable regulatory rate, not just the possibility of acquiring such a rate from an authority selecting rates within a prescribed range containing confiscatory and fair rates. (JA, 62.)